STEPHEN J. WINDHORST, Judge.
| .¿Defendant, Roland, Dibartolo, was charged with simple burglary of an inhabited dwelling in violation of La. R.S. 14:62.2. After a competency hearing, he was found competent to stand trial. Defendant proceeded to trial by jury and the jury found him guilty as charged. Defendant pled guilty to a habitual offender bill, and he was sentenced as a second felony offender to twelve years at hard labor without benefit of probation or suspension of sentence. Defendant appeals, alleging that the evidence presented was insufficient to prove him guilty beyond reasonable doubt. We affirm defendant’s conviction and sentence.
Saleh Omar had resided at 1921 Cedarwood Avenue with his wife and two children since 2007. He was working the evening of May 26, 2013, and around 2:00 A.M., he left work and went to his father’s house. While at his father’s house, Mr. Omar’s wife called and queried if he was outside of their home because she heard someone trying to open the door. Mr. Omar told his wife to call the police, and she placed him on hold while she dialed 9-1-1. Mr. Omar drove to his home, and when he arrived approximately fifteen minutes later, the police were outside “with the guy, like handcuffed and everything.” Mr. Omar had never met that individual before and he did not have permission to be in Mr. Omar’s house.
| aSara Omar was home with her two daughters, who at the time of the incident were aged ten and two, on the night of May 26, 2013. Mrs. Omar said there were no cars in the driveway when her husband left for work that evening. When it was *756 time for bed, the eldest daughter went to her room and the youngest daughter retired with Mrs. Omar in the master bedroom. Mrs. Omar stayed awake, as she was waiting for her sister in Egypt to call her. Around 1:30 A.M., she heard “something in the window” in the toy room. Earlier that day, Mrs. Omar had locked the toy room from the inside, and therefore, in order to open the door from the outside, she would have to use something like “a hairpin.” The window in the toy room was locked, and wood was placed against it.
Mrs. Omar testified that when she heard the window “being tried to [be] opened,” she called her husband to inquire if it was he at the window. He informed her that he was not, and she dialed 9-1-1 because it was “a thief.” Mrs. Omar then grabbed her two children and locked herself and her daughters in the master bathroom, which was inside of the master bedroom. While there, she heard “something like they opened the door, like the doorknob.” She was unsure which door, but she could tell it was a door on the inside of her house and not the front door. Mrs. Omar stated that she never heard anyone walking in the house and that there was nothing out of place or missing. She also did not hear anyone yelling for “Mike,” “Cathy,!’ “mom,” or anyone else, and the house was completely quiet. Ms. Omar testified that she did not know the defendant and she had not given him permission to enter her home.
Deputy Dwain Rullman with the Jefferson Parish Sheriffs Office was dispatched to a high priority call at 1921 Cedarwood Avenue and was the first deputy on the scene. He parked his car, approached the house on foot, and first stopped at a fence and peered through, where he witnessed defendant “exiting out |4of the house, actually the window that leads into the house.” When Deputy Rullman observed defendant exiting the window, he saw “his feet, his legs, his upper torso and then his head” in that order. Deputy Rullman walked around to the other side of the residence with his gun drawn to meet defendant, defendant approached him, and the Deputy ordered him onto the ground. Additional deputies arrived and assisted defendant to the ground and handcuffed him. Along with another deputy, Deputy Rull-man entered the residence, following defendant’s route through the window, to investigate the residence. The door of that room (the toy room) was not locked.
Once defendant was handcuffed on the ground, Deputy Rullman spoke with defendant who provided a litany of reasons why he was in the area, first declaring that his mother lived at that residence, and then stating that his mother lived in the area. Defendant then asserted that he had a friend that lived in the area, and he had met “Mike and Cathy” earlier that day and he was looking for them. Deputy Rullman testified that defendant’s apartment on Ruby Street is “within the area” and is a “good little walking distance” from the Omars’ residence. Defendant told the Deputy that the window had been open, and he just leaned in and called out the names “Mike” and “Cathy.” When Deputy Rullman had approached the house, he did not hear anyone yelling out those names.
Defendant took the stand and testified to his version of events. He testified that on the night in question, he was walking from his apartment, which was “like a block away” and he was headed to “Brother’s Store” which was on the same street the victims lived on. He had taken Se-roquel for his schizophrenia and the medication made him drowsy. He testified that earlier that day, two friends had called and told defendant where they were and to *757 “Come over there.” While walking to “Brother’s Store” he stopped at the victims’ house, which looked like | Bthe correct house of where his friends were located, however it was the wrong house. He knocked on both the front and side doors and no one answered. He went to the back of the house, and there was a side window that was open. He “kind of pushed the window in and moved the curtain and [he] hollered Tiffany, [he] hollered Tiffany, Mike, [he] said anybody in there.” He first said that he stood there yelling the names “Cynthia,” “Tiffany,” and “Mike” for about two minutes, and later amended his response and said that he yelled “like three times.” No one came so he went to the front of the house and knocked one more time. Once he knocked, “not two minutes later,” the officer came up behind him, and “flashed his flashlight.” Defendant testified that three of the officers jumped him and “put their billy clubs in [his] back” and hit him. He said he was never in the house, and he was just at the wrong door knocking. He testified he was “only by the window” and he “put [his] head and hollered.”
Defendant also testified that when he looked through the window, he did not see anything in there. He said the room only had children’s toys, there was nothing valuable there, and he had no reason to take kids’ toys.
Defendant also testified he had been previously arrested “170-something times” and that he had a conviction for two armed robberies in 1994 when he was seventeen years old and a conviction in Orleans Parish for possession with intent to distribute a false narcotic.
DISCUSSION
In his only assignment of error, defendant alleges that the evidence was insufficient to support his conviction for simple burglary of an inhabited dwelling. Defendant argues that there was no evidence that he entered the Omars’ residence, turned the doorknob in the home, appropriated or intended to take any property, or disturbed anything in the home. Defendant concedes that his conduct of standing | ¿in an open window at 2:00 a.m. and yelling into it could be perceived as odd but contends that his diagnosis of schizophrenia puts his behavior into perspective.
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), is “whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” See State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922, 930, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998); State v. Smith, 12-247 (La.App. 5 Cir. 12/11/12), 106 So.3d 1048 writ denied, 13-494 (La.7/31/13), 118 So.3d 1120. Both the direct and circumstantial evidence must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. Smith, 12-247 at 6, 106 So.3d at 1053; State v. Harrell, 01-841 (La.App. 5 Cir. 2/26/02), 811 So.2d 1015, 1019. “Circumstantial evidence is evidence of facts or circumstances from which one might infer or conclude, according to reason and common experience, the existence of other connected facts.” Smith, 106 So.3d at 1053; State v. Kempton, 01-572 (La.App. 5 Cir. 12/12/01), 806 So.2d 718, 722. “The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” La. R.S. 15:438; Smith, 106 So.3d at 1053.
*758 When the trier of fact is confronted by conflicting testimony, weight of the testimony rests solely with that judge or jury, who may accept or reject, in whole or in part, the testimony of any witness. State v. Mitchell, 09-996 (La.App. 5 Cir. 5/25/10), 40 So.3d 1122, writ denied, 10-1557 (La.10/21/11), 73 So.3d 370. See also State v. Bailey, 04-85 (La.App. 5 Cir. 5/26/04), 875 So.2d 949, 955, writ denied, 04-1605 (La.11/15/04), 887 So.2d 476, cert. denied, 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d 468 (2005). It is therefore, not the “function of the appellate court to assess the credibility of witnesses or to reweigh the evidence absent impingement on the fundamental due process of law.” Mitchell, 40 So.3d at 1127. The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by a defendant offers an exculpatory explanation of events. Id. Rather, the reviewing court must determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. Id. See also State v. Mitchell, 99-3342 (La.10/17/00), 772 So.2d 78, 83.
In the present case, defendant was convicted of simple, burglary of an inhabited dwelling, which is defined by La. R.S. 14:62.2 as “the unauthorized entry of any inhabited dwelling, house, apartment or other structure used in whole or in part as a home or place of' abode by a person or persons with the intent to commit a felony or any theft therein.” Therefore, to uphold defendant’s conviction, the state must prove each of the following elements beyond a reasonable doubt at trial: “(1) there was an unauthorized entry, (2) the structure was inhabited at the time of entry, and (3) the defendant had the specific intent to commit a felony or theft inside the structure.” State v. Schnyder, 06-29 (La.App. 5 Cir. 6/28/06), 937 So.2d 396, 400.
Defendant argues that he did not enter the home, and he did not have specific intent to commit a felony or theft. He does not dispute that the house was inhabited at the time. The evidence clearly shows that the Omars were residing at the house at the time, and Mrs. Omar was actually inside the residence with her two children and called 9-1-1 at the time of the incident.
| ^Unauthorized Entry
“Entry” is not statutorily defined by and for purposes of R.S. 14:62.2, but this Court has held that entry transpires whenever any part of the accused’s person passes the line of the threshold, and it is sufficient that any part of the person intrudes into the structure, even momentarily. State v. Arceneaux, 05-338 (La.App. 5 Cir. 12/27/05), 930 So.2d 44, 48-49; State v. Smith, 02-1018 (La.App. 5 Cir. 3/11/03), 844 So.2d 119, 125. The Louisiana Supreme Court in State v. Bryant, 12-233 (La.10/16/12), 101 So.3d 429, analyzed the term “entry” and concurred with its universal definition and held that “entry” occurs when any part of the intruder’s person crosses the plane of the threshold. Bryant, 101 So.3d at 432-33. The State must also prove that the accused did not have permission to enter the premises. State v. Tran, 97-640 (La.App. 5 Cir. 3/11/98), 709 So.2d 311, 316-17.
In this case, defendant’s fingerprints were found on the exterior of the window. Both Mr. and Mrs. Omar testified that they had never seen defendant before and had never granted defendant permission to enter their residence, and therefore there was no legitimate purpose for defendant’s fingerprints to be on the window. Tran, supra at 317.
Deputy Rullman actually witnessed defendant “exiting out of the house, actually *759 the window that leads into the house.” When Deputy Rullman observed defendant exiting the window, he saw “his feet, his legs, his upper torso and then his head” in that order. Defendant argued in his brief that the Deputy “could not say definitively whether [defendant] was entering, exiting, or merely in the window;” however, the testimony demonstrated Deputy Rullman perceived defendant as “exiting.” Nevertheless, it inconsequential for the purpose of “entry” whether defendant was entering, exiting, or simply in the window because the | aevidence, including defendant’s own testimony, was sufficient to show that, at a minimum, defendant did cross the threshold of the Omars’ residence. Defendant’s fingerprints were identified on the exterior of the window, defendant testified he “put [his] head” in the window and hollered, he testified that he “accidentally touched the window,” and when he “moved the curtain [he] touched the window” and further stated that he “pushed the window enough where [he] could move the curtain and holler.” Thus, the evidence demonstrated at least some part of his body entered the home. Bryant, supra.
In addition, Mrs. Omar testified that she knew that someone was in her home because she heard the turning of an interior doorknob. Ms. Omar also testified that she did not know defendant, that he did not have permission to enter her home, and that the window was locked. We therefore find that the State proved its burden of the first element of the statute regarding unauthorized entry.

Specific Intent

The remaining element of the crime which must be proven is that the offender must have specific intent to commit a felony or a theft in the structure entered. This intent may be inferred from the circumstances and actions of the accused. Arceneaux, 05-338, 930 So.2d at 49; State v. Smith, 463 So.2d 16, 18 (La.App. 5 Cir.1985). Specific intent is “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” La. R.S. 14:10(1). Therefore, specific intent is subjective in character and need not be proven as a fact, but rather inferred from the circumstances of the case. Tran, 709 So.2d at 317. Whether a defendant possessed the requisite intent in a criminal case is a query for the trier of fact, and the Jackson standard guides a review of the appropriateness of this determination. Arceneaux, 930 So.2d at 49; Tran, 709 So.2d at 317.
linAs previously noted, “The trier of fact makes credibility determinations, and may, within the bounds of rationality, accept or reject the testimony of any witness, at its discretion.” State v. Untereiner, 11-402 (La.App. 5 Cir. 12/13/11), 82 So.3d 425, 432, writ denied, 12-0025 (La.4/20/12), 85 So.3d 1268. In the absence of internal contradiction or irreconcilable conflict with physical evidence, a witness’s testimony, if believed by the trier of fact, is adequate support for a requisite factual conclusion. See also State v. Sosa, 05-213 (La.1/19/06), 921 So.2d 94. The credibility of witnesses is not to be reweighed on appeal, and the appellate court may impinge on the fact-finder’s discretion only to the extent necessary to guarantee the fundamental due process of law. Untereiner, 82 So.3d at 432.
In this case, defendant was discovered exiting the Omars’ window at 2:00 A.M. The window was inside of the victims’ fence, and the defendant testified that he opened the gate to get in. The Omars had never seen defendant prior to that incident, defendant did not have permission to be on the property, and Mrs. Omar testified that the window had been locked. *760 Defendant never claimed he knew the Omars or had consent to be on their premises. When restrained by Deputy Rull-man, defendant provided various reasons as to why he was on the Omars’ premises, including his mother lived in the house, his mother lived in the area, his friends lived in the area, and he was looking for two individuals he had met earlier that day. Mrs. Omar testified the door to the toy room was locked, and when Deputy Rull-man investigated the premises, the toy room door was unlocked. Mrs. Omar also stated that while she was in the master bedroom with her children, she heard an interior doorknob turning. During cross-examination, defendant testified he looked into the toy room and saw “nothing” there.
Defendant also testified that he took nothing and that none of the Omar’s possessions were found on his person when he was arrested. However, specific | ^intent to commit a felony or theft when entry occurs can be found even when nothing is taken. State v. Smith, 463 So.2d at 19.
In addition, defendant took the stand and testified that he had been arrested over 170 times; however, he did not have any convictions for simple burglary of a dwelling. Defendant testified that he that he had a previous conviction for two counts of armed robbery, and a conviction for selling false narcotics. In State v. Hardy, 14-1569 (La.11/21/14), 154 So.3d 537, the Louisiana Supreme Court stated that other crimes evidence could be considered as a circumstance to show specific intent to commit a burglary.[1]
While there was no direct evidence of defendant’s intent to commit a theft or felony once inside the residence, the jury heard considerable circumstantial evidence relevant to this element, most of which was not disputed. Such evidence included that the window through which defendant entered was inside victims’ fence which surrounded their back yard; that this occurred around 2:00 A.M.; that there was no vehicle present, and from the exterior there was no indication of anyone present in the residence; that the gate through he entered was closed; that the windów through he entered was locked; that defendant noted there was nothing valuable to take in the room[2]; that defendant offered police several different inconsistent and unfeasible explanations for why he entered the window; and that defendant had relevant previous convictions and arrests. After weighing evidence and credibility, a jury could rationally infer from the circumstances and reasonably |12conclude that defendant had entered with intent to commit a theft or felony inside, even if he ultimately did not.
The jury heard testimony from the victims, from the police officer, and from defendant himself. Defendant took the *761 stand to explain his version of events. Therefore, the jury was able to consider his explanation of simply being at the incorrect residence. Obviously, the jury believed the victims and the police officer, and did not believe the defendant. Examining all of these factors we find that a rational trier of fact could have found, to the exclusion of every reasonable hypothesis of innocence, that defendant did have specific intent to commit a theft or robbery at the Omars’ residence.
Considering the foregoing, we find that the evidence presented was sufficient to sustain defendant’s conviction for simple burglary of an inhabited dwelling.
ERRORS PATENT
We have reviewed the record for errors patent according to the mandates of La. C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975) and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990) and find none which require corrective action.
Defendant’s conviction and sentence are therefore affirmed.
AFFIRMED.

. In Hardy, the defendant was charged with simple burglary of an uninhabited dwelling. He sought to exclude evidence of prior simple burglary convictions to under La. CE. Art. 404B. In finding the other crimes evidence admissible, the Court said that "We find evidence of defendant's prior burglary convictions probative because they are sufficiently similar to defendant’s simple burglary charge and are substantially relevant to the question of whether he had the specific intent to commit a theft at the moment he allegedly broke the window[J" 154 So.3d at page 539 (Emphasis added).

. The issue is simply whether intent to commit a theft was present at the time of entering. Even if defendant did not take or attempt to take anything, noticing whether there was anything valuable to take could be, in the light of other circumstances, considered an indication that he was thinking of doing so as he first looked in, but found nothing worth taking. We also note that this was not brought up by defendant, but came only as an affirmative response by defendant to a question on cross-examination.